SMITH and ROBINSON, JJ., dissent.

SMITH *v.* MAY.

5-1793                                                    323 S. W. 2d 551

Opinion delivered April 6, 1959.

[Rehearing denied May 25, 1959]

*Paul K. Roberts,* for appellant.

*Max M. Smith,* for appellee.

CARLETON HARRIS, Chief Justice. This litigation involves a controversy over 16.10 acres of land located in Cleveland County. Appellees instituted suit against appellants on November 24, 1956, alleging actual possession of the aforementioned acreage and other lands for more than 50 years, the payments of taxes, and asserted that they had received the rents and profits therefrom. The complaint alleged that appellants were claiming some interest in said property, based upon a certain deed held by appellants, and the prayer was that title to the property be vested and confirmed in appellees. Appel-

lants answered, denying the allegations, asserting their ownership of the property by virtue of a deed dated May 17, 1921, and asked that title to the property be quieted in them. Subsequently, the Smiths filed a motion to dismiss the suit ''because all parties with an interest in the property involved in this suit have not been made parties to this suit, as plaintiffs, or defendants,'' and later filed another motion to dismiss, alleging that the statute providing for the quieting and confirmation of titles had not been complied with. On hearing, the court denied the motions to dismiss, finding actual service on appellants, found that the lands in controversy were not wild and unimproved, that appellees had acquired title by adverse possession, and quieted title in appellees ''subject to the rights of any parties who may not have become a party to this action to assert such rights as may exist.'' From such decree, comes this appeal.

Appellants' claim to the 16.10 acres is based upon a quitclaim deed to them from R. J. May and Dora May (parents of appellee May herein), dated May 17, 1921, and also by clerk's tax deed dated November 20, 1956. Appellees Moore, Glover and Attwood claim their interest through Victor Moore,[1] who on December 31, 1935, under a partition deed in the I. E. Moore estate, was deeded, among other lands ''southwest Quarter (SW¼) the Southeast Quarter (SE¼) of the Northwest Quarter (NW¼) all in Section Twenty (20) Township Nine (9) South, Range Ten (10) West.'' These appellees have continued in possession and paid taxes through 1956. Appellee May received a deed from his mother in 1955, but all appellees claim by adverse possession. The land herein involved in this litigation, and claimed by the Moore heirs is known as tract No. 2. May, who claims what is known as tract No. 1 in this litigation, testified that ''I farmed this north part of tract No. 1 ever since I can remember, and had an old fence around it near the road. This is an old road outside the fence, and farmed it until the tornado in 1927 and it laid out one year. In 1928 I continued to farm it, and built another little house on

---

[1] Victor Moore was the son of I. E. Moore, the latter receiving a deed on May 27, 1912 to "part of SE¼, NW¼, Sec. 20, 9-10" from Charles and Lucy Kerns.

the edge of it. Tenants were in there and farmed it along with this other land up until 1935. In 1937 I rented this farm out to Victor Moore and he farmed his own farm and this one, and I have a photograph to show it was farmed, and I have witnesses out here to show it was farmed." May is presently in possession of the premises claimed by him, and he had no knowledge of appellants making any claim to the land until 1957. He testified that tract No. 2 was farmed originally by Mr. I. E. Moore; that the land was terraced in the '30's, and that Mr. Leon Moore subsequently farmed the land. May stated that he had seen crops on it, and there had been fences around both tracts. He further testified that the tracts were last in cultivation "in the '40's." Don Ashcraft, a neighbor, testified that the lands had not been farmed in five or six years; that there was formerly a sawmill on tract No. 2 and it was common knowledge in the neighborhood that timber was being cut off the land; that he had never seen Smith on the premises. Larry Barton, an employee for the Soil Conservation Service, examined some aerial photographs showing the property in 1938, and testified that the photographs showed terrace lines and cleared land. Tom Rushing testified that he farmed and lived on the May land from 1936 to 1942, and that all the land was fenced; that he worked tract No. 1 involved in the law suit. He stated that Smith never came on the place, nor did he attempt to collect rents or occupy the property. Don Adams stated that he farmed the May place in 1941 and '42, and that the "old Kern place" was also being farmed by his brother-in-law; that he had all of his dealings with Victor Moore, and never did see or hear of Smith claiming any interest in the land. I. E. Moore (grandson of the I. E. Moore heretofore referred to) testified that his father, Leon Moore, worked the Kern place through 1936, and "we run cattle in there up to last year." Mark S. Glover, son-in-law of the deceased Victor Moore, testified that he had been in charge of the Victor Moore estate since 1946, and had been in possession of the Kern place; that it was farmed until 1951 or '52, and had since been converted to timber; that he sold timber off the premises, and had collected rents and paid the taxes; that it had recently been placed

"in the soil bank." As previously stated, appellant, A. E. Smith, received a deed to the property on May 17, 1921; however, he testified that he had never cultivated any of the land (nor seen it in cultivation), had never cut any timber off of it, and had only been on the lands three or four times since 1921. In fact, appellant's deed was not recorded until January 12, 1952, a period of nearly 31 years. No explanation is given for the failure to record the deed for that period of time, except that "I thought I would find the land every time I could get a surveyor. I couldn't get nobody to do nothing." He stated that he had 1,500 acres of land, and "I can't keep up with all of it." Smith started paying taxes in 1951 on the lands in litigation under a different description, and accordingly, both appellants and appellees were paying taxes on the property. The record does not reflect who was responsible for the double assessment. Smith paid from 1951 through 1957, except for the year 1953, and the property was sold for that year's taxes to Mayme McMurtrey, who subquently assigned her certificate of sale to this appellant. In November, 1956, Smith received the Clerk's Tax Deed to the property.

It is difficult to understand why one claiming property in his own county of residence, would not record his deed for over 30 years, did not pay taxes for 30 years, and only visited the premises four times during that period. The evidence clearly shows that the lands were farmed, off and on, and it would certainly seem that appellants would have known that others were making use of the lands and claiming same.

Appellants contend that if the lands were once improved, they reverted back to an unimproved state, and Smith's tax payments entitled him to the property. In *Bratton* v. *Union Sawmill Company,* 168 Ark. 637, 271 S. W. 32, this Court said:

"It may be that, when fields, once cleared and cultivated, have been abandoned and permitted to go to waste and grow up in briars and brush and the fences become dilapidated and destroyed, the lands will be regarded as unimproved and uninclosed, as though they had never

been, but we think this condition must be shown before the title to lands , once improved and inclosed, can be acquired by the payment of taxes in accordance with said law. In other words, if the lands are shown to have been improved or inclosed during any of the seven years, the successive payment of taxes for which would have conferred title upon the person paying the taxes if they had been unimproved and uninclosed, it would defeat the claimant's title thereto.''

The record does not clearly reflect that these lands have been permitted to go to waste, and have reverted to their original unimproved state; in fact, the preponderance of the evidence is to the contrary. Subsequent to the conclusion of the testimony, the Chancellor filed a written opinion in which he, *inter alia,* stated:

''\* \* \* The plaintiff's tax receipts show payment for well over 7 years. Defendant Smith also showed payment of taxes for 7 years. It seems that the lands in controversy have been on the assessment rolls under differing descriptions.

Does the payment of taxes by Defendant Smith under color of title interrupt the 7 years adverse possession of plaintiffs?

''The record doesn't show who was responsible for the double assessment.

If the Assessor be at fault, it would not be equitable to permit the payment of additional taxes by defendant, Smith, with no notice to the plaintiffs, to redound to the benefit of the defendant. If the Assessor, on his own motion changed the description, he should have taken the other description off the assessment roll. On the other hand, if defendant Smith assessed the land in controversy under a different description than under which they were already assessed, and if defendant Smith paid taxes under the differing descriptions, then it would be inequitable to permit him to take the advantage of his own erroneous act.

The defendant relies upon the Quitclaim Deed executed in 1921 and recorded in 1952. At the time of its execu-

tion the deed was color of title. No explanation is offered for the 30-odd years delay in recording the instrument. Defendant made no effort to secure actual possession during the time his deed remained off of record. The plaintiffs and their predecessors in title exercised all of the attributes of possession and claimed ownership which vested title to them by adverse possession. * * *''

We are unable to say that the Chancellor's findings are against the preponderance of the testimony.

Affirmed.